Pro Se 7 (Rev. 12/16)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **NATHAN EDMONDS,**<br><br>Plaintiff pro se,<br><br>v.<br><br>**DELTA AIR LINES, INC.,**<br><br>Defendant. | Civil Action No.: **1:26-CV-1989**<br><br>**JURY TRIAL DEMANDED**<br><br>**COMPLAINT FOR EMPLOYMENTDISCRIMINATION** |

## I. THE PARTIES TO THIS COMPLAINT

### A. The Plaintiff

**Name:** Nathan Edmonds

**Street Address:** 130 Chesapeake St. S.W.

**City and County:** Washington, District of Columbia

**State and Zip Code:** D.C. 20032

**Telephone Number:** (202) 538-2279

**E-mail Address:** nathan.edmonds202@gmail.com

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

APR 1 3 2026

KEVIN P WEIMER, Clerk
By:                     Deputy Clerk

### B. The Defendant

**Defendant No. 1:** Delta Air Lines, Inc.

**Job or Title:** Employer (501+ employees)

**Street Address:** 1030 Delta Blvd

**City and County:** Atlanta, Clayton County

**State and Zip Code:** Georgia 30354

**Telephone Number:** (404) 715-2600

### C. Place of Employment

**Name:** Delta Air Lines, Inc. — Atlanta (ATL) TechOps

**Street Address:** 1030 Delta Blvd

**City and County:** Atlanta, Clayton County

**State and Zip Code:** Georgia 30354

**Telephone Number:** (404) 715-2600

## II. BASIS FOR JURISDICTION

This action is brought for discrimination in employment pursuant to (check all that apply):

[X] Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (race, color, gender, religion, national origin).

[ ] Age Discrimination in Employment Act of 1967, as codified, 29 U.S.C. §§ 621 to 634.

[ ] Americans with Disabilities Act of 1990, as codified, 42 U.S.C. §§ 12112 to 12117.

[X] Other federal law: 42 U.S.C. § 1981 (race discrimination in contractual employment relationship); 42 U.S.C. § 1981a (compensatory and punitive damages for intentional discrimination).

[ ] Relevant state law:

[ ] Relevant city or county law:

## III. STATEMENT OF CLAIM

**A. The discriminatory conduct of which I complain in this action includes (check all that apply):**

[ ] Failure to hire me.

[ ] Termination of my employment.

[ ] Failure to promote me.

[ ] Failure to accommodate my disability.

[X] Unequal terms and conditions of my employment.

[X] Retaliation.

[X] Other acts: Hostile work environment; supervisor harassment including repeated unwanted physical conduct after Plaintiff's objections and repeated management notice; obstruction of internal appeal rights; intentional misrepresentation in disciplinary documentation and federal legal proceedings; issuance of discipline in violation of Defendant's own written DAT policies; and employer liability for failure to terminate a supervisor engaged in ongoing harassment despite documented, repeated written requests to management and outside legal counsel from August 2025 through the present date.

**B.** It is my best recollection that the alleged discriminatory acts occurred on the following dates:

March 14, 2023 (discriminatory FVC); August 4, 2025 (retaliatory CAN); and continuing through the present date, including most recently on or about April 1, 2026 (ongoing supervisor harassment and unwanted physical conduct).

**C.** I believe that Defendant:

[X] is still committing these acts against me.

[ ] is not still committing these acts against me.

**D.** Defendant discriminated against me based on my (check all that apply and explain):

[X] race — African American. Plaintiff, an African American Aircraft Maintenance Technician (AMT), was subjected to discriminatory discipline for conduct for which similarly situated Caucasian employees were not disciplined, and was subsequently subjected to retaliation, hostile work environment, and ongoing supervisor harassment for filing an EEOC charge of race discrimination and for engaging in other protected activities.

[ ] color

[ ] gender/sex

[ ] religion

[ ] national origin

[ ] age
[ ] disability or perceived disability

**E. The facts of my case are as follows.**

*See Attachment A — Statement of Facts (incorporated herein by reference).*

## IV. EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

**A.** Charges filed with the EEOC regarding the alleged discriminatory conduct:

**EEOC Charge No. 410-2023-08357 (Race Discrimination):** Filed July 12, 2023. Amended September 2025 to add false appeal information and CRP obstruction.

**EEOC Charge No. 410-2025-14322 (Retaliation):** Filed December 31, 2025.

*Note: Plaintiff intends to file an additional EEOC harassment charge based on ongoing conduct through the present date. Count III is presented here to provide notice and will be supplemented upon receipt of a Right-to-Sue letter on that charge.*

**B.** The Equal Employment Opportunity Commission:

[X] issued a Notice of Right to Sue letter, which I received on the following dates:

Retaliation Charge (#410-2025-14322): Received January 16, 2026. Filing deadline: April 16, 2026.

Discrimination Charge (#410-2023-08357): Received January 28, 2026. Filing deadline: April 28, 2026.

*Copies of both Notices of Right to Sue are attached as Exhibit 1 and Exhibit 2.*

## V. RELIEF

Plaintiff respectfully requests that this Court enter judgment against Defendant Delta Air Lines, Inc. and award the following relief:

### A. Compensatory Damages

Compensatory damages under 42 U.S.C. § 1981a for emotional distress, mental anguish, anxiety, insomnia, loss of enjoyment of life, and psychological harm caused by Defendant's discriminatory, retaliatory, and harassing conduct. Plaintiff's injuries include a medically-documented leave of absence from April 22 to May 21, 2025, caused by the hostile work environment. Plaintiff's Short-Term Disability claim, filed with supporting medical records, was denied on May 21, 2025. The harassment continues to the present date. Plaintiff seeks the maximum compensatory damages permitted under 42 U.S.C. § 1981a for an employer with more than 500 employees: $300,000.00.

### B. Punitive Damages

Punitive damages under 42 U.S.C. § 1981a and 42 U.S.C. § 1981 for Defendant's intentional, malicious, and reckless conduct, including: (1) the deliberate misdirection of Plaintiff to an internal appeal process that Defendant's own legal counsel knew to be unavailable, denying Plaintiff any meaningful review of the discriminatory 2023 FVC; (2) the submission of materially false statements to the EEOC in violation of Defendant's own Rules of the Road, which identifies dishonesty with government investigators as grounds for termination; (3) the participation of a conflicted supervisor in the DAT disciplinary process while an active EEOC discrimination charge was pending against his brother-in-law; (4) the issuance of the August 2025 CAN one disciplinary step above what Defendant's own written DAT policy authorizes; (5) eight months of deliberate refusal to terminate or reassign the harassing supervisor despite formal written notice to management, HR, and outside legal counsel; and (6) the knowing use of false statements in the internal investigation record to obstruct Plaintiff's retaliation claims. Plaintiff seeks punitive damages in an amount to be determined by the jury.

### C. Injunctive Relief — Personnel Actions

1. An order requiring Defendant to immediately terminate the employment of Rafael Garcia based on: (a) his documented participation in the DAT disciplinary proceeding that produced the August 4, 2025 Corrective Action Notice, while Defendant's management and outside legal counsel were aware that Garcia is the brother-in-law of Dave Freue, the manager named in Plaintiff's active EEOC discrimination charge, and while Plaintiff had formally expressed discomfort with Garcia as his supervisor specifically because of that relationship to both Mones Law Group and HR in April-May 2025 — constituting a structural conflict of interest that produced a retaliatory disciplinary outcome; (b) Garcia's repeated violations of Defendant's own EEO Policy, which explicitly prohibits intentional physical conduct constituting unwanted touching; (c) Defendant's automatic liability under EEOC employer liability standards for supervisor harassment resulting in a negative employment action, as confirmed by the EEOC harassment guidelines transmitted in writing to Defendant's outside counsel on April 7, 2026; (d) Defendant's forfeiture of any affirmative defense under Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998) due to eight months of deliberate inaction despite documented written notice; and (e) Defendant's own anti-retaliation policy, which states that retaliation is grounds for discipline up to and including termination.

2. An order requiring Defendant to expunge the March 14, 2023 Formal Verbal Coaching from Plaintiff's personnel file.

3. An order requiring Defendant to expunge the August 4, 2025 Corrective Action Notice from Plaintiff's personnel file.

4. An order prohibiting Defendant from retaliating against Plaintiff for filing this lawsuit or for any prior protected activity.

### D. Injunctive Relief — Records Preservation

5. An order requiring Defendant to immediately confirm the issuance of a litigation hold preserving all records related to this matter from August 7, 2025 forward, the date on which Defendant's outside counsel Kathleen Mones was first copied on Plaintiff's formal appeal of the CAN. Records to be preserved include without limitation: aircraft maintenance Log Pages 7130954, 7130960, and 1030007; all DAT records, classifications, severity ratings, Lifesaver designation determinations, and participant lists relating to the June-July 2025 proceeding; all HR investigation records for case HRC2559278; all EthicsPoint complaint records; all camera and surveillance footage from Defendant's ATL TechOps facility from June 2025 through the present; and all communications involving Freue, Garcia, Ward, Rawson, Bourne, Davison, May, Smith, Chadzutko, Mones, Wexler, Taylor, and Thompson relating to Plaintiff from January 2023 to present.

6. An order requiring Defendant to produce: (a) the identity and title of the GM-level or higher official whose presence was required at the DAT proceeding under Defendant's own DAT flowchart if a TechOps Lifesaver designation was applied; (b) documentation confirming that official's attendance; and (c) the written Lifesaver designation record, if any exists. If Defendant cannot produce these records, Plaintiff submits that the CAN was issued without the mandatory GM+ presence required by Defendant's own written policy, rendering the disciplinary action procedurally void and constituting further evidence of its retaliatory nature.

7. An order requiring Defendant to produce the complete vehicle key log records for company vehicles 491696, 491160, 491501, 491499, and 491436, covering the same timeframe referenced in the March 14, 2023 Formal Verbal Coaching issued to Plaintiff. These records will establish whether keys for those vehicles were retained overnight or across shifts by employees other than Plaintiff during the relevant period — the identical inquiry Freue conducted for Plaintiff's vehicle alone, and deliberately chose not to conduct for any other vehicle. This production is necessary to establish the full scope of disparate treatment in Count I: Plaintiff was singled out for discipline while similarly situated Caucasian employees engaged in the same alleged conduct without consequence.

### E. Injunctive Relief — Systemic Workplace Reform

The following systemic remedies are warranted by the pattern of structural failures documented in this case, which enabled discriminatory and retaliatory conduct to persist unchecked through multiple layers of Defendant's management, HR, and legal organizations:

8. An order requiring Defendant to publish and maintain, accessible to all TechOps employees on Deltanet, a plain-language summary of the DAT disciplinary process including: the flowchart logic for each classification

type, the severity rating criteria, the criteria for TechOps Lifesaver designation, the specific progressive discipline step that applies to each classification and severity combination, and the employee's right to receive written notice of the classification, severity rating, and progressive discipline step applied in any DAT proceeding affecting them.

9.  An order requiring Defendant to implement a mandatory written recusal policy prohibiting any manager who is the subject of an active complaint or investigation — or who has a personal, familial, or close professional relationship with such a manager — from participating in any DAT, disciplinary, or performance development proceeding affecting the complainant. Compliance to be documented in writing for each DAT proceeding.

10.  An order requiring Defendant to allow any TechOps employee who is the subject of a disciplinary meeting or investigation interview to have a representative present — a coworker of their choosing or a neutral HR representative not affiliated with the investigating management chain — upon the employee's written request, with the employee's request and Defendant's response documented in the investigation record.

11.  An order requiring Defendant to reform its Conflict Resolution Process to ensure: (a) all disciplinary documentation accurately and specifically states whether CRP review is available for that document type; (b) the CRP Gatekeeper is required to respond in writing within 10 business days of any employee submission; and (c) no employee is directed to an appeal channel that is categorically unavailable for their document type.

12.  An order requiring Defendant to provide written investigation findings to any employee who files an EthicsPoint or HR complaint within 60 days of the complaint being filed, including: a summary of what was investigated, the findings reached, and the corrective action if any taken. Closures stating only that "appropriate action was taken" without findings shall be deemed non-compliant with this order.

13.  An order requiring Defendant to implement mandatory annual anti-retaliation and anti-discrimination training for all TechOps supervisors, with each supervisor required to sign an individual written certification acknowledging: (a) that retaliation against employees who report discrimination is grounds for termination under Defendant's own Rules of the Road; (b) that dishonesty with government investigators is grounds for termination under Defendant's own Rules of the Road; and (c) that all employment decisions must be based on legitimate business reasons, not on protected characteristics, under Defendant's own EEO Policy.

14.  An order requiring Defendant to submit annual reports to this Court for a period of five years documenting: all disciplinary actions taken at ATL TechOps broken down by race and management level; all EthicsPoint complaints filed and their disposition outcomes; all DAT proceedings and the classifications, severity ratings, and progressive discipline steps applied; all employee requests for recusal or conflict of interest review and their disposition; and all instances in which disciplinary documentation directed an employee to an appeal process subsequently determined to be inapplicable.

## F. Back Pay and Lost Benefits

14.  Back pay and lost benefits for compensation, opportunities, and career advancement lost as a result of Defendant's unlawful conduct, including the 18-month corrective action period (August 4, 2025 through February 4, 2027) during which Plaintiff's career mobility was restricted, in an amount to be determined at trial.

## G. Attorney's Fees and Costs

15.  Attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k), should Plaintiff obtain counsel, or such other fees and costs as the Court deems appropriate.

## H. Such Other and Further Relief

17.  Appointment of counsel pursuant to 28 U.S.C. § 1915(e)(1). Plaintiff is proceeding pro se and has simultaneously filed an Application to Proceed In Forma Pauperis with this Complaint. Prior to filing pro se, Plaintiff made diligent efforts to obtain private legal representation, contacting more than ten law firms regarding representation in this matter. Each declined to accept the case, primarily because Plaintiff remains currently employed by Defendant. Because Plaintiff is still employed, his claims do not present the contingency fee structure — typically based on lost wages from termination — that most employment discrimination attorneys require to take a case on contingency. Plaintiff's continued employment is itself a product of his protected status and his determination not to be constructively discharged; it should not operate as a barrier to legal representation or to this Court's consideration of appointed counsel. This case presents complex questions of employment

discrimination, retaliation, and hostile work environment law under Title VII and 42 U.S.C. § 1981, involving multiple adverse actions spanning over three years, extensive documentary evidence including audio recordings, aircraft maintenance log pages, internal corporate policy documents, and a Deviation Analysis Tool flowchart analysis demonstrating that Defendant's own written policies were violated in issuing the challenged discipline. The hostile work environment continues to the present date. The interests of justice would be served by the appointment of counsel to assist Plaintiff in the prosecution of these claims.

18. Such other and further relief as this Court deems just and proper.

## VI. CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

**Date of signing:** _____

Signature of Plaintiff:    _____

Printed Name:        Nathan Edmonds

Address:          130 Chesapeake St. S.W., Washington, D.C.  20032

Telephone:        (202) 538-2279

## ATTACHMENT A — STATEMENT OF FACTS
### Nathan Edmonds v. Delta Air Lines, Inc.
*United States District Court, Northern District of Georgia, Atlanta Division*

### BACKGROUND

1. Plaintiff Nathan Edmonds is an African American Aircraft Maintenance Technician (AMT) employed by Defendant Delta Air Lines, Inc. ("Delta") since March 18, 2013. His hourly rate is $56.69. He works at Delta's Atlanta (ATL) TechOps facility, 1030 Delta Blvd, Atlanta, Georgia 30354. Employee ID: 316390.

2. Delta Air Lines, Inc. employs more than 500 employees and is subject to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and 42 U.S.C. § 1981.

3. Plaintiff has maintained consistently satisfactory to above-average performance ratings throughout his employment, including "Exceeds Expectations" ratings received after the August 2025 disciplinary action at issue in this complaint. These ratings confirm that the discipline imposed on Plaintiff was not performance-based.

4. At all times relevant, Rafael Garcia ("Garcia") served as Plaintiff's Shift Manager and direct supervisor. Garcia is the brother-in-law of Dave Freue ("Freue"), the Station Manager against whom Plaintiff filed EEOC Charge No. 410-2023-08357 in July 2023. Garcia has remained Plaintiff's direct supervisor throughout the events described herein, despite Plaintiff's documented written requests for his removal beginning in April-May 2025 and continuing through the present date.

5. Delta's Rules of the Road — its own written code of conduct — contains the following binding commitments relevant to this case: (a) the EEO Policy prohibits "intentional physical conduct, such as unwanted touching" and conduct based on race that "creates an offensive, intimidating, hostile or negative work environment"; (b) the Anti-Retaliation Policy states that "Delta does not tolerate retaliation of any kind" and that "Delta will investigate and take appropriate disciplinary action, up to and including termination, against employees who retaliate"; (c) the Investigation and Litigation Policy states that "your lack of honesty or cooperation is grounds for your termination" when dealing with government officials and investigators; and (d) the Raise a Concern policy provides employees with multiple reporting channels including HR, EthicsPoint, and the Ethics and Compliance Team. Plaintiff utilized every one of these channels. Defendant failed to comply with every one of these commitments.

### COUNT I — RACE DISCRIMINATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2, AND 42 U.S.C. § 1981

6. On January 9, 2023, Plaintiff contacted Manager Freue to report disrespectful treatment by Shift Manager Chris Terrell ("Terrell"). At all times relevant to Count I, Terrell served as Plaintiff's direct Shift Manager on the C&D gates overnight shift. Terrell was a direct report of Freue, who was at that time serving as Station Manager for ATL domestic line maintenance while transitioning to the IMA manager position at TOC 5. Terrell managed both Plaintiff and Charles Desbourne on that shift. On January 10, 2023, Freue called Plaintiff, yelled at him, made a false accusation about a parking violation, and questioned Plaintiff's use of the company vehicle -- which included the vehicle key issue that would later form the basis for the FVC. On the same day, January 10, 2023 at 12:23 PM, Plaintiff sent a written email to Freue stating: "due to the nature of our conversation, the tone that was directed at me, the misrepresentation and misquotation of my previous questions about parking solutions, I am requesting that an HR representative be present at our meeting. I do not feel comfortable discussing this matter further without someone from HR present. I want to ensure that an unbiased representative is present to hear all of the facts." This January 10, 2023 email constitutes Plaintiff's first documented protected activity. It is preserved and will be produced as Exhibit 8. The February 8, 2023 meeting with Freue and HR Representative Kenneth Smith was a direct product of this written HR request -- it did not occur because Freue voluntarily sought to address Plaintiff's concerns, but because Plaintiff demanded HR protection in writing after Freue's hostile and misrepresentative conduct.

7. On February 8, 2023, Plaintiff met with Freue and HR Representative Kenneth Smith ("Smith") at TOC 5. Plaintiff raised multiple examples of workplace discrimination and disparate discipline affecting Black employees compared to Caucasian employees, including the practice of retaining company vehicle keys. Freue stated he would investigate and follow up. Only Freue, Smith, and Plaintiff attended this meeting. Freue later falsely

claimed in Delta's EEOC position statement that Terrell also attended -- a claim Plaintiff can refute with documentary evidence. This false claim is not merely inaccurate. It is strategically significant. Terrell was the direct Shift Manager responsible for the C&D gates overnight crew -- the shift on which the fuel incident occurred and on which both Plaintiff and Desbourne worked. Had Terrell actually been present at the February 8 meeting and heard Plaintiff raise the fuel incident, Terrell would have had a direct supervisory obligation to investigate, because it happened on his shift. By excluding Terrell from the meeting and then falsely claiming he was present, Freue simultaneously ensured Terrell had no documented notice of the complaint and retroactively created the false appearance that the responsible shift manager had been informed -- deflecting accountability away from Freue while leaving the incident uninvestigated. At the February 8 meeting, Plaintiff also raised a separate incident in which fuel had been deliberately poured on the tools of an African American mechanic on the C&D gates overnight shift -- the same shift and location where Plaintiff worked. Plaintiff was aware of the identity of the victim but chose not to name him, as the victim had handled the matter on his own terms and Plaintiff believed it was not his place to identify the victim without his consent. Plaintiff expected that Freue -- who was at that time transitioning from his Station Manager role overseeing ATL domestic line maintenance, which included the C&D gates overnight shift, to the IMA manager position at TOC 5 -- would at minimum direct Terrell, his direct report and the responsible Shift Manager, to investigate the incident on his own shift. Freue did not need Plaintiff to identify anyone. He knew his crew. His direct report Terrell managed that crew. Freue stated he would investigate. He never did, and he never directed Terrell to do so either.

8.  On March 14, 2023, Plaintiff received a Formal Verbal Coaching ("FVC") issued under Terrell's name but authored by Freue, as Terrell admitted at delivery. The FVC was for an alleged vehicle key policy violation. It was authored on February 14, 2023 — six days after Plaintiff informed Freue that Caucasian coworkers engaged in the same conduct — without any investigation of those comparators. Freue admitted he checked the key history only for Plaintiff's vehicle. No Caucasian employee who retained a vehicle key received discipline. The FVC was placed permanently in Plaintiff's personnel file with a 12-month escalation clause. Plaintiff documented the vehicle identification numbers of company vehicles present in his work area during the relevant period, including vehicles 491696, 491160, 491501, 491499, and 491436. Key log records for these vehicles covering the same timeframe referenced in the FVC would show whether keys for those vehicles were also retained overnight or across shifts by other employees — records Freue chose not to pull when he investigated only Plaintiff's vehicle.

9.  Under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) framework, Plaintiff establishes his prima facie case: (a) Plaintiff is African American, a protected class; (b) Plaintiff was qualified for his position as AMT with over ten years of satisfactory service; (c) Plaintiff suffered an adverse employment action — the FVC placed permanently in his file with a 12-month escalation clause, which constitutes "some harm" to the terms and conditions of employment under Muldrow v. City of St. Louis, 601 U.S. 346 (2024); and (d) Plaintiff was treated differently than similarly situated Caucasian employees who committed the same or similar vehicle key conduct without discipline. Under Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981), the burden shifts to Defendant to articulate a legitimate nondiscriminatory reason — which it cannot sustain given the absence of any investigation of Caucasian comparators.

10.  Defendant's stated reason for the FVC is pretext. The evidence of pretext is overwhelming: Freue issued the discipline six days after learning of Caucasian comparators; Freue investigated only Plaintiff's vehicle key history; Freue never investigated the discrimination claims Plaintiff raised at the February 8 meeting; Freue submitted false statements to the EEOC to cover his conduct; Delta's own Rules of the Road required Freue's termination for those false statements but no action was taken; and the FVC was authored by Freue under another manager's name. Freue's claim in his EEOC position statement that he could not investigate the fuel incident because Plaintiff refused to provide names is demonstrably pretextual and contradicted by timestamped documentary evidence. The victim of the fuel incident was Charles Desbourne, an African American mechanic on the same C&D gates overnight shift. Plaintiff learned Desbourne's identity through a single conversation with a coworker, without any managerial authority or access to personnel records. On March 17, 2023 -- three days after receiving the FVC -- Plaintiff texted Desbourne directly to ask whether management had ever contacted him about the treatment of Black employees on the shift. Desbourne responded: 'Nope.' This text exchange, timestamped March 17, 2023 at 4:19 AM, is preserved and will be produced as Exhibit 5. It establishes that as of three days after the FVC, management had not contacted the victim of the fuel incident -- despite Freue being Desbourne's direct manager, having full access to the overnight crew roster, and having cameras installed in TOC 5. Plaintiff chose not to name Desbourne at the February 8 meeting out of respect for Desbourne's right to come forward on his own

terms. That decision placed the investigative burden exactly where it belonged: on the manager. Freue never acted on that burden. Five months later, he filed an EEOC position statement claiming the investigation was impossible because Plaintiff refused to provide names -- a statement Freue knew was false when he made it. Freue was not a stranger to this crew. At the time of the February 8 meeting he was the outgoing Station Manager overseeing ATL domestic line maintenance, transitioning to the IMA manager role. Terrell -- the direct Shift Manager for C&D gates overnight -- was Freue's direct report. Freue did not need Plaintiff's help to find Charles Desbourne. He needed only to direct his own direct report to ask the Black mechanics on his shift what had happened. He chose not to do either. The investigation he later claimed was impossible required nothing more than one conversation between a manager and his direct report. This selective non-investigation of discrimination against Black employees -- while simultaneously investigating policy violations by Black employees with full use of available resources -- is direct evidence of discriminatory intent. The contrast is made explicit by Freue's own subsequent conduct: in March 2025, Freue used those same TOC 5 cameras to terminate Desbourne for lying about wearing safety glasses, reviewing footage and using it as evidence to support termination. Freue found the evidence when he wanted to find it. He claimed inability only when the investigation would have exposed discrimination against Black employees. Under Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998), the broad interpretation of "because of" a protected characteristic applies: the totality of this evidence establishes that Plaintiff was disciplined because of his race.

10a.  The foregoing conduct also establishes a racially discriminatory double standard in Delta's application of its own disciplinary policies. Desbourne subsequently transferred voluntarily from ATL Domestic to IMA (TOC 5) in late 2023 or 2024, seeking a fresh start following his experience on the C&D gates overnight shift -- which included the fuel incident. The transfer placed Desbourne directly under Freue's management at IMA, the same facility Freue had moved to when transitioning out of his domestic line maintenance role. Desbourne, who had experienced racial harassment on Freue's prior shift, now reported to Freue again in a different building. A coworker who worked with Desbourne at IMA observed that management appeared to be systematically building a case for Desbourne's termination from the time he arrived. In March 2025, Freue participated in the termination of Desbourne for lying about wearing safety glasses at the time of a workplace eye injury. Freue used camera footage from the same TOC 5 cameras -- cameras he had installed -- to confirm that Desbourne's safety glasses were on his head rather than on his face at the time of the injury, and used that footage to support the termination for dishonesty. At the time of Desbourne's termination, Freue's own EEOC position statement -- filed in August 2023 and never corrected -- contained deliberate false statements, including the claim that Terrell attended the February 8, 2023 meeting. Plaintiff had already informed Defendant's outside counsel Mones of these false statements in April 2025, weeks before Desbourne's termination. Delta's own Rules of the Road Investigation Policy states that lack of honesty with government officials is grounds for termination. Freue thus participated in terminating a Black employee for workplace dishonesty while he himself had made deliberate false statements to a federal agency -- conduct Delta's own policy identifies as equally termination-eligible. Delta allocated its investigative resources and disciplinary authority to hold a Black mechanic accountable for a safety misrepresentation, while protecting a white manager who lied to the EEOC. This is the same selective application of Delta's policies that produced the discriminatory FVC in the first place. The pattern raises an additional question for discovery: whether Desbourne's transfer into Freue's direct management at IMA, and his subsequent termination, were connected to his status as the victim of the 2023 fuel incident that Freue had failed to investigate and concealed in his EEOC position statement.

11.  Plaintiff appealed the FVC through the Conflict Resolution Process ("CRP") as directed by the FVC documentation itself. CRP Gatekeeper Enrique Perez acknowledged the appeal as "under review" and then ceased all communication. Delta's own legal counsel later stated in Delta's EEOC position statement that FVCs are never CRP-eligible — directly contradicting the written directions on the FVC. On September 17, 2025, Delta HR admitted on audio recording: "The gatekeeper made an error. You received misinformation. We will own that." Three minutes later, Bourne retracted this admission. This contradiction — admitting and then denying the misinformation in the same recorded meeting — is itself evidence of consciousness of guilt. This misrepresentation denied Plaintiff any internal appeal remedy for the discriminatory 2023 discipline.

12.  Plaintiff filed EEOC Charge No. 410-2023-08357 on July 12, 2023, alleging race discrimination. The charge was amended in September 2025 to add the false appeal information and CRP obstruction. The EEOC issued a Notice of Right to Sue on January 28, 2026. All administrative remedies are exhausted. Plaintiff's claims under 42

U.S.C. § 1981 are additionally independent of the EEOC exhaustion requirement and are brought to ensure full recovery of intentional discrimination damages.

## COUNT II — RETALIATION IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-3

13.  Following each of Plaintiff's protected activities — the January 10, 2023 written HR request documenting Freue's hostile conduct and demanding an unbiased HR representative be present at any meeting (Exhibit 8); the February 8, 2023 HR meeting where Plaintiff raised discrimination concerns including the fuel incident; the July 12, 2023 EEOC discrimination charge, the February 21 and April 21, 2025 EEOC position rebuttals, and the September 2025 amended EEOC charge — Defendant engaged in a pattern of escalating adverse actions. Under Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), an adverse action in the retaliation context is anything that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Every adverse action described below satisfies this standard.

14.  Beginning February 21, 2025, immediately after Plaintiff submitted his first EEOC position rebuttal, a hostile work environment commenced: associates of Freue confronted Plaintiff about his EEOC filing; management monitored Plaintiff's movements via workplace cameras; and multiple coworkers approached Plaintiff on separate occasions about his EEOC charge. This pattern caused Plaintiff to take a medically-documented leave of absence from April 22 to May 21, 2025. Plaintiff's Short-Term Disability claim, supported by medical records, was denied on May 21, 2025.

15.  In April-May 2025, Plaintiff expressed to Delta's outside counsel Kathleen Mones (Mones Law Group) and HR Managing Director Brittany May his discomfort with Garcia remaining as his direct supervisor due to Garcia's familial relationship with Freue. This request was not addressed. Garcia remained Plaintiff's supervisor.

16.  On June 16-17, 2025, Plaintiff was one of at least five AMTs assigned to repair a hydraulic leak on Aircraft 6715, case drain module (Log Page 7130954). Plaintiff worked from an elevated position in the pylon and did not torque the pressure inlet B nut that subsequently failed. Coworker Christopher Ramsaroop checked out the tools Plaintiff used on Plaintiff's behalf. All mechanics submitted written statements at management's request. A hydraulic failure was recorded on the aircraft's flight to Miami (Log Page 7130960); the Miami technician documented: "PRESSURE INLET B NUT LOOSE ON FILTER MODULE FOR LEFT ENGINE PRESSURE AND CASE DRAIN MODULE." Delta's Boeing 757 Aircraft Maintenance Manual (Task 29-11-17-404-027) and Illustrated Parts Catalog provide specific torque procedures that would have identified which mechanic torqued the failed nut. Delta chose selective enforcement rather than proper investigation.

17.  On the night of June 17, 2025, after Aircraft 6715 returned to Atlanta, Plaintiff was the only mechanic from the Log Page 7130954 team called back to assist with additional component replacements (Log Page 1030007, employee number 316390). This selective recall demonstrates that management had already begun singling Plaintiff out before any discipline was issued.

18.  Between June 17 and July 31, 2025, Defendant conducted a Deviation Analysis Tool ("DAT") proceeding to determine discipline arising from the Aircraft 6715 incident. Station Manager Mike Rawson confirmed at the September 17, 2025 close-out meeting (audio recorded) that: (a) the incident was classified as an "individual error," not a violation; (b) severity was classified as "major"; and (c) Plaintiff's disciplinary file was clean. Applying Defendant's own Individual Error DAT flowchart to these three confirmed inputs: the baseline is Formal Verbal Coaching (Step 1), escalated +1 step for major severity = Written Coaching (Step 2). A CAN (Step 3) is only reachable if the event is additionally designated a TechOps Lifesaver — which Rawson never stated — and only if a GM-level or higher official is present at the DAT, which has not been confirmed. The CAN issued to Plaintiff was one disciplinary step above what Defendant's own written policy authorizes.

19.  Garcia participated in the DAT proceeding that produced Plaintiff's CAN — confirmed by Rawson on the September 17, 2025 audio recording: "James and Ralph both sat in the same room when this process went through." At the time of the DAT, Defendant's management and outside legal counsel were aware that: (a) Plaintiff had an active EEOC discrimination charge naming Freue; and (b) Plaintiff had formally expressed to both Mones Law Group and HR that he was uncomfortable with Garcia as his supervisor specifically because of Garcia's family relationship with Freue. Despite this documented prior notice of the conflict of interest, Defendant allowed Garcia to participate in the DAT. The outcome was a CAN issued solely against Plaintiff, one step above what Delta's own flowchart authorizes, while five other mechanics who worked the same repair received no discipline.

20. On August 7, 2025, Plaintiff submitted a formal written appeal of the CAN and request for independent investigation to Managing Director Mindy Davison and Director of Line Maintenance Joseph Santos, with Defendant's outside counsel Kathleen Mones copied. This is the first documented instance of Defendant's outside legal counsel being placed on direct written notice of the retaliation, hostile work environment, and Garcia conflict of interest claims — over seven months before the March 2026 settlement proposal. Plaintiff formally requested Garcia's removal as supervisor, an independent investigation, and documentation of the retaliation concern in the investigative record.

21. During the HRC2559278 investigation, HR Manager Danielle Bourne conducted an intake meeting with Plaintiff on August 8, 2025. Plaintiff stated during that meeting that he had confirmed no other mechanic received documentation. Plaintiff escalated to Davison on August 12, 2025, describing in writing the exact exchange: Plaintiff stated "No, I have confirmed no one else received documentation," to which Bourne questioned how Plaintiff could know this. This August 12 email is timestamped documentary proof — predating by months Bourne's October 6 false claim — that Plaintiff raised the selective discipline issue during the August 8 intake meeting itself. Plaintiff submitted a seven-point written statement to Davison on August 14, 2025 again raising selective discipline and the CRP obstruction.

22. On September 17, 2025, a close-out meeting was held for case HRC2559278 (audio recorded). In addition to the admissions described in paragraphs 11 and 18 above, Rawson admitted at timestamp 40:14: "I'm learning all this today. I have no idea what's going on" — confirming that the Station Manager who supervised both Ward and Garcia was unaware the CAN had been issued, raising serious questions about the authorization of the discipline. Bourne falsely accused Plaintiff of "snatching" the CAN — a characterization Plaintiff denied on the record at timestamp 32:51 and refuted with the accurate sequence of events. Bourne entered this false characterization into the official investigation record based solely on Ward's uncorroborated account.

23. In her October 6, 2025 close-out email, Bourne falsely stated Plaintiff raised selective discipline "for the first time" at the close-out. This statement is directly contradicted by: (a) the August 8 intake meeting record; (b) Plaintiff's August 12 email to Davison quoting his own words from that meeting; (c) Plaintiff's August 14 written statement; and (d) the September 17 audio recording itself at timestamp 37:59. Bourne used this false characterization to announce a new safety investigation into Aircraft 6715, potentially re-opening disciplinary exposure against Plaintiff. No contact regarding that investigation has been received as of the filing date.

24. On March 17, 2026, Plaintiff submitted a formal Pre-Suit Settlement Proposal to Defendant's in-house legal team (Larry Wexler, Meg Taylor, and David G. Thompson), explicitly documenting that Garcia remained his direct manager and that the hostile work environment was ongoing. Delta forwarded the proposal to Mones, who acknowledged receipt March 18. On March 23, 2026, Mones called Plaintiff and informed him that Delta's committee would not negotiate a settlement.

25. Plaintiff filed EEOC Charge No. 410-2025-14322 on December 31, 2025, alleging retaliation. The EEOC issued a Notice of Right to Sue on January 16, 2026. All administrative remedies on this charge have been exhausted.

26. The foregoing conduct constitutes unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a). Under Burlington Northern, each adverse action — the hostile work environment, the selective Aircraft 6715 discipline, the improper CAN, the false investigation findings, and the ongoing supervisor harassment — would dissuade a reasonable worker from engaging in protected activity. The temporal proximity between protected activities and adverse actions, the conflict of interest in the DAT process, the procedural deviation from Defendant's own written DAT policies, and Defendant's deliberate refusal to remedy hostile conditions despite repeated documented notice establish that Plaintiff's protected activity was a but-for cause of the adverse actions taken against him.

## COUNT III — HOSTILE WORK ENVIRONMENT AND SUPERVISOR HARASSMENT IN VIOLATION OF TITLE VII, 42 U.S.C. § 2000e-2

27. Plaintiff incorporates by reference all preceding paragraphs.

28. Since August 2025, Garcia has engaged in a repeated pattern of unwanted physical contact and personal space violations directed at Plaintiff. Garcia has repeatedly approached Plaintiff and requested or initiated handshakes knowing that Plaintiff is avoiding him, has formally requested his removal as supervisor, and has documented the

conflict of interest arising from Garcia's relationship with Freue. Garcia's conduct occurs both during disciplinary and workplace interactions and separately in the general workplace — Garcia approaches Plaintiff knowing Plaintiff is deliberately avoiding him. Documented incidents include: multiple incidents in August 2025; March 23, 2026 (overnight shift, the same day — within hours — of Defendant's outside counsel informing Plaintiff that Delta would not settle); and April 1, 2026 (Wednesday), the most recent documented incident as of the filing date.

29. Under the EEOC's published harassment guidelines — a copy of which was transmitted in writing to Defendant's outside counsel on April 7, 2026 — harassment is unlawful where it is severe or pervasive enough to create a work environment a reasonable person would consider intimidating, hostile, or abusive. Garcia's conduct is pervasive: it is committed by Plaintiff's direct supervisor who controls the terms of Plaintiff's employment; it occurs with knowledge that Plaintiff has formally complained about the conflict of interest and requested Garcia's removal; it persists despite multiple formal written requests; and it occurs in the context of an ongoing EEOC discrimination charge against Garcia's brother-in-law.

30. Defendant is automatically liable for Garcia's supervisor harassment under Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). The August 4, 2025 CAN — produced by the DAT in which Garcia participated — is a negative employment action triggering automatic liability. To the extent the Court applies the hostile work environment standard, Defendant cannot satisfy either prong of the affirmative defense: (1) Defendant did not reasonably try to prevent and promptly correct the harassing behavior — it took zero corrective action for eight months despite documented written notice to management, HR, and outside legal counsel; and (2) Plaintiff did not unreasonably fail to use corrective opportunities — he used every channel Delta's own Rules of the Road provides, including his leader, HR, EthicsPoint, and direct communication with management and outside legal counsel.

31. Plaintiff has given Defendant repeated, documented written notice of Garcia's conduct and requested his removal through eight separate communications: (a) the August 7, 2025 formal appeal emailed to Davison, Santos, and Mones; (b) the August 23, 2025 email to Davison stating Garcia's "antics were getting worse" and the situation was "volatile"; (c) the August 17, 2025 EthicsPoint complaint; (d) the HRC2559278 investigation; (e) the September 17, 2025 recorded close-out meeting; (f) the March 2026 formal pre-suit settlement proposal to Defendant's in-house legal team explicitly noting Garcia's continued role; (g) the April 7, 2026 telephone call to Mones during which Plaintiff formally notified Defendant of intent to file an EEOC harassment charge and transmitted the EEOC's published harassment guidelines in writing; and (h) this Complaint. Garcia remains Plaintiff's supervisor as of the filing date.

32. Defendant's own EEO Policy explicitly prohibits "intentional physical conduct, such as unwanted touching" and conduct that "creates an offensive, intimidating, hostile or negative work environment." Defendant's own Anti-Retaliation Policy requires disciplinary action up to and including termination against employees who retaliate. Plaintiff informed Defendant's outside counsel on April 7, 2026 that a non-management Delta employee engaging in the same conduct as Garcia toward a coworker would have been terminated — and that Garcia's conduct persists because he knows he faces no consequences, a pattern Defendant's deliberate inaction has enabled. Defendant's application of different accountability standards to supervisors than it would apply to hourly employees constitutes further evidence of the inequitable and discriminatory work environment Plaintiff has endured.

33. Plaintiff intends to file an additional EEOC harassment charge based on the ongoing conduct through the present date. Count III is presented here to provide formal notice to Defendant and to preserve all applicable rights. Plaintiff will file a supplemental or amended complaint upon receipt of a Right-to-Sue letter on that charge.

34. The foregoing conduct constitutes an unlawful hostile work environment and supervisor harassment in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1). Defendant is liable under the employer liability doctrine for supervisor harassment, having failed to take any corrective action despite documented, repeated written notice spanning more than eight months and reaching Defendant's management, HR, and outside legal counsel.

*Exhibits attached: Exhibit 1 — EEOC Right-to-Sue Letter (#410-2025-14322, Jan. 16, 2026); Exhibit 2 — EEOC Right-to-Sue Letter (#410-2023-08357, Jan. 28, 2026); Exhibit 3 — Formal Verbal Coaching (March 14, 2023); Exhibit 4 — Corrective Action Notice (dated July 31, 2025, received August 4, 2025). Additional exhibits to be filed as discovery proceeds, including: Exhibit 5 -- text message exchange between Plaintiff and Charles*

*Desbourne dated March 17, 2023 at 4:19 AM, in which Desbourne confirmed management had never contacted him regarding the treatment of Black employees on the C&D gates overnight shift; Exhibit 6 -- written statement of Charles Desbourne confirming he was never contacted by management about the fuel incident at any point during his employment at Delta; and Exhibit 7 -- documentation relating to Desbourne's March 2025 termination under Freue's management at IMA (TOC 5); and Exhibit 8 -- email from Plaintiff to Freue dated January 10, 2023 at 12:23 PM requesting HR presence at any meeting due to Freue's hostile tone, false accusations, and misrepresentation, constituting Plaintiff's first documented protected activity.*

Respectfully submitted,

_____

**Nathan Edmonds**, Plaintiff Pro Se
130 Chesapeake St. S.W.
Washington, D.C.  20032
(202) 538-2279
nathan.edmonds202@gmail.com
Date: _____



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

### Issued On: 01/16/2026

**To:** Mr. Nathan Edmonds
130 Chesapeake St SW
Washington, DC 20032

**Charge No:** 410-2025-14322

EEOC Representative and email:   Anna Bigby
Senior Investigator
anna.bigby@eeoc.gov

---

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2025-14322.

On behalf of the Commission,

Digitally Signed By:Darrell E. Graham
01/16/2026
Darrell E. Graham
District Director

**Cc:**
**Delta Air Lines**
6000 N Terminal Pkwy
Atlanta, GA 30320

**Erin Harris**
1030 Delta Blvd
Atlanta, GA 30320

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2025-14322 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2025-14322 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/28/2026

**To:** Nathan Edmonds
130 Chesapeake St S.W.
Washington, DC 20032
Charge No: 410-2023-08357

EEOC Representative and email:   GARICA WALKER
INVESTIGATOR
GARICA.WALKER@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2023-08357.

On behalf of the Commission,

Digitally Signed By:Darrell E. Graham
01/28/2026
Darrell E. Graham
District Director

Cc:
Kathleen Mones
Mones Law, P.C.
191 Peachtree Street N.E., Ste. 3950
Atlanta, GA 30303

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2023-08357 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2023-08357 to the District Director at Darrell E. Graham, 100 Alabama Street, SW Suite 4R30, Atlanta, GA 30303.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.



**Chris Terrell**
Shift Manager

**Delta Air Lines, Inc.**
1030 Delta Blvd
Atlanta, GA 30354
T. 404-714-7155
M. 678-972-9447
Christopher.terrell@delta.com

February 14th, 2023

TO:      Nathan Edmonds

FROM:    Chris Terrell

SUBJECT:    Formal Verbal – Conduct

Nathan, I want to see you succeed as a Delta employee, but I am very concerned about your recent conduct. On January 10th, 2023, it was brought to my attention that you had utilized a D concourse company vehicle as a personal transport to and from the line and TOC 5 to enter and exit the airport at the start and end of your shift. After a review of Key Tracer system, it was discovered that this has been occurring as far back as October 2022. This resulted in a vehicle being pulled out of the operation for the duration of the day due to the vehicle and key being away from its designated area and unknown to the department. We also found that the key would be returned and re-issued to yourself each morning at the end of your shift in order to bypass the regular notifications we have in place to account for missing vehicles.

Following procedures as set forth by Delta is a core requirement of your position. You must show immediate and lasting improvement in your conduct. I am now giving you this Formal Verbal Coaching to be sure you fully understand my concerns and the Company's expectations. Company vehicles are to be used only during your work hours for company business. At the beginning of each shift, the Lead Mechanics will issue you or your crew a key to which you will return to the key tracer box and re-check out in your name. Additionally, once your shift is complete you are expected to turn your assigned key into the Key Commander box.

Your success is important to me. However, if you do not immediately improve your conduct or if you do not follow all Company policies and meet our expectations, you may receive more serious Corrective Action. This letter will remain in your file until January 10th + 12 months unless you receive additional written Corrective Action before that time, in which case it will remain until all written Corrective Action has expired.

Delta's Employee Assistance Program provides confidential services at no cost as a resource to support you in managing issues you may be dealing with in or out of the workplace. For EAP assistance, you may call (800) 533-6939.

If you wish to appeal this decision, you may do so through the divisional peer review process by the TechOps CRP group at CRP.TechOps@delta.com

March 1, 2012

Nathan, please understand the importance of following procedures and take the necessary steps for immediate and lasting improvement. I am confident of your ability to succeed. I am willing to assist you, but the ultimate responsibility for correcting your conduct is yours.

Kind Regards,

Chris Terrell


I have read and fully understand the contents of this letter.

_____    / /4 MAR23
Acknowledgement of Receipt                      Date


cc: Manager
    Employee File

March 1, 2012



**DELTA**

**James Ward III**
Shift Manager
Line Maintenance
ATL – 250
A Concourse

**Delta Air Lines, Inc.**
Department 250
990 Toffle Terrace
Atlanta GA 30354
M. 404-703-4235
James.X.Ward@delta.com

July 31, 2025

To:        Nathan Edmonds, 316390, AMT, 250/ATL

From:      James Ward III, Shift Manager

Re:        Corrective Action Notice — Compliance

Nathan, I want to see you succeed in your Delta employment, but I am very concerned about your job performance. On the night of 6/17/25 you worked on an A/C 6715 hydraulic leak on the number one engine. A damaged O-ring was found on the union Filter Module supply line. You failed to follow the AMM step-by-step, which resulted in the left system hydraulic quantity loss during cruise, which resulted in a declared emergency.

Following the AMM instructions in sequence is a core requirement of your position, and you have received the training necessary for this area of your role.  As compliance is a significant factor when serving our customers in your AMT role, this incident is unacceptable. When you deviate from compliance, you put yourself and others at risk.

You are receiving this Corrective Action Notice to be sure you fully understand the concern and the importance of changing your behavior to meet expectations. If you do not immediately improve your performance, or if you do not follow all Company policies and meet our expectations, you may receive more serious Performance Development up to and including a review for continued employment.

The Corrective Action Notice will be active from today's date plus 18 months of active employment which will be equal to or greater than 01/31/27. If you receive additional Performance Development action while the Corrective Action Notice is active, this Notice will remain active until all Performance Development actions have expired.

If you wish to appeal this decision, you may do so through the divisional peer review process by contacting the TechOps CRP group at CRP.TechOps@delta.com

Delta's Employee Assistance Program provides confidential services at no cost as a resource to support you in managing issues you may be dealing with in or out of the workplace. For EAP (Employee Assistance Program) assistance, you may call (800) 533-6939.

March 1, 2012

Nathan, please understand the importance of maintaining dependable job performance and take the necessary steps to make immediate and lasting improvement. I am willing to assist you, but the ultimate responsibility for improvement is yours.

March 1, 2012